## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COLORADO

Civil Action No.:

ANNA BARBER, Derivatively on Behalf of FARMLAND PARTNERS INC.,

      Plaintiff,

v.

PAUL A. PITTMAN,
LUCA FABBRI,
CHRIS A. DOWNEY,
JAY B. BARTELS,
JOSEPH W. GLAUBER,
JOHN A. GOOD,
ROBERT L. COWAN,
DARELL D. SARFF,
JOHN C. CONRAD,
THOMAS S.T. GIMBEL,
D. DIXON BOARDMAN,

      Defendants,

      -and-

FARMLAND PARTNERS INC.,

      Nominal Defendant.

---

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, VIOLATION OF SECURITIES LAW, INSIDER SELLING, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT AND JURY TRIAL DEMAND

---

Plaintiff Anna Barber ("Plaintiff"), by and through her counsel, derivatively on behalf of

Nominal Defendant Farmland Partners Inc. ("Farmland Partners," "FPI," or the "Company"),

submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Farmland Partners with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Farmland Partners; (iii) a purported consolidated securities case pending in the United States District Court for the District of Colorado against Farmland Partners and defendants Paul A. Pittman ("Pittman") and Luca Fabbri ("Fabbri") for alleged violations of federal securities laws, captioned *The Turner Agency Inc. et al., v. Farmland Partners, Inc., et al.,* Case No. 1:18-cv-02104-DME-NYW (the "Securities Class Action" or "Securities Action") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, from November 12, 2015 through July 10, 2018 (the "Relevant Period") that failed to disclose to FPI investors that the Company was loaning money to related parties in violation of Generally Accepted Accounting Principles ("GAAP") and Financial Accounting Standards Board ("FASB") Accounting Standards; and (iv) other publicly available information, including media and analyst reports, concerning Farmland Partners.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action asserting claims for violation of securities law, breach of fiduciary duty, waste of corporate assets, insider selling, and unjust enrichment, against certain officers and members of the Company's Board of Directors (the "Board").

2.    Farmland Partners is a real estate investment trust ("REIT") that owns, acquires, and finances farmland in North America. According to its filings with the SEC, FPI is the largest public farmland REIT in the country, with a portfolio consisting of approximately 166,000 acres spanning across seventeen states.

3.    Through a new loan program started by FPI on August 20, 2015 (the "Loan Program"), which the Individual Defendants touted as being synergistic to the Company's core business of renting farmland, FPI repeatedly loaned money to, among potentially other related parties, Jesse Hough ("Hough") and Ryan Niebur ("Niebur"). Hough was, *inter alia,* FPI's co-founder, a key FPI consultant, a long-time business associate of FPI's Chief Executive Officer ("CEO") Pittman, and a co-worker of Pittman and FPI's Chief Financial Officer ("CFO") Fabbri. Similarly, Niebur was an FPI manager and long-time co-worker of Pittman and Fabbri.

4.    The ties between Pittman and Hough run deep. Pittman and Hough are long-time business associates who have conducted extensive business together – both in FPI and outside of it – since at least 2011. Since 2013, Pittman and Hough have almost continuously been directors and officers of Pine Ridge Holdings ("Pine Ridge"). They have also worked together in American Agriculture Corporation, along with Fabbri, who served as that company's Senior Vice President. Moreover, in January 2012, Pittman and Hough formed Pittman-Hough Farms, LLC ("Pittman Hough") as a merger of their personal farmland holdings. Pittman and Hough (as

well as certain members of Hough's family) owned 100% of Pittman Hough. In 2014, Pittman and Hough spun off the majority of their Pittman Hough land holdings and co-founded the Company.

5.     The Individual Defendants did not disclose the identity of the borrowers in the Loan Program to FPI investors, nor did they disclose that Hough and Niebur were the actual recipients of the majority of the loans and, in fact, accounted for 70% of all of the monies loaned in the Loan Program. Rather, the Individual Defendants misrepresented to investors that FPI conducted the same meaningful due diligence for the purported "third-party" borrowers in the Loan Program as it did for the Company's farm acquisition business. As a result of the foregoing, FPI investors were unaware about the true nature and risk of the Loan Program during the Relevant Period.

6.     Unfortunately, the loans given to Hough and Niebur were risky and certain of them ran into trouble. Several of these loans were either renegotiated, defaulted, wrapped into new loans, or the borrower (Niebur) went bankrupt. In some cases, FPI acquired the property when a loan defaulted and then entered into a lease with the same related party who had defaulted on the loan. None of this, however, was disclosed to FPI investors.

7.     The related party loans to Hough and Niebur were required to be disclosed pursuant to GAAP. GAAP requires companies to disclose the details of related party transactions because such transactions are oftentimes not negotiated at arm's-length and therefore pose a unique risk to a company.  The Individual Defendants were well aware of their duties to disclose related party transactions because FPI included other related party disclosures in its public

filings. However, upon information and belief, these loans may not have been disclosed to conceal that the Loan Program was designed, at least in part, to benefit related parties.

8. Between August 2017 and April 2018, around the same time that FPI made a $5.25 million loan to Hough, which more than doubled the monies loaned in the Loan Program from $4 million to $9.25 million, four of FPI's directors and its President resigned. In March 2018, FPI also inexplicably switched auditors. This spate of resignations and change in auditors –so close to FPI's January 2018 $5.25 million loan to Hough – suggests that FPI directors and its auditor were uncomfortable with FPI's undisclosed related party dealings.

9. Additionally, as a result of the false and misleading statements described above, the market price of the Company's securities was artificially inflated during the Relevant Period. During the Relevant Period, the Individual Defendants caused the Company to perform common stock buybacks, whereby the Company repurchased its outstanding common stock at prices that were artificially inflated due to the false and misleading statements.

10. Furthermore, defendants Jay B. Bartels ("Bartels") and D. Dixon Boardman ("Boardman") (collectively, the "Insider Selling Defendants") breached their fiduciary duties of loyalty and good faith by selling shares of Company stock while in possession of material adverse non-public information.

11. On July 11, 2018, the truth of the related party loans was revealed by a *Seeking Alpha* report. The *Seeking Alpha* report, which contained documentary evidence, revealed to FPI investors for the first time that the majority of the loans in the Loan Program were, in fact, made to related parties Hough and Niebur:

**Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible**

> FPI...has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not disclosed),...Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant.

12.   The *Seeking Alpha* report further revealed that numerous loans in the Loan Program had defaulted, been renegotiated, were wrapped into new loans, or were threatened by bankruptcy (in the case of Niebur) – further demonstrating that there were serious problems in FPI's screening process for loans in the Loan Program despite the Company's public representations concerning its rigorous due diligence.

13.   The *Seeking Alpha* Report also stated that, as a result of the foregoing, "[w]e believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up."

> Lastly, the *Seeking Alpha* Report stated that "we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency." One month later, on August 8, 2018, this came into fruition as FPI did, in fact, cut its quarterly dividend – by more than half – to 5 cents a share compared with its most recent dividend of 12.75 cents.

14.   As a result of the foregoing false and misleading statements, the Company, Pittman, and Fabbri are named as defendants in the Securities Action. On June 18, 2019, the Securities Action survived a motion to dismiss filed by the defendants, with Judge David M. Ebel ("Judge Ebel") finding:

> Here, the plaintiffs' allegations describe with adequate specificity the two misleading statements Farmland allegedly made to the public—first, its statements about loaning money to "third parties," which omitted related party disclosures, and, second, its statement about performing due diligence to screen potential borrowers equivalent to the due diligence used for potential farm acquisitions.

* * *

Whether plaintiffs have alleged facts sufficient to state a section 10(b) claim based on Farmland's statements and omissions related to its transactions with Niebur and Hough depends on whether plaintiffs have alleged facts sufficient to show that those individuals were "related parties" at the relevant times. The plaintiffs have done so.

* * *

Because plaintiffs have adequately alleged that Niebur and Hough were related parties during the relevant times, plaintiffs have adequately alleged that defendants gave misleading information regarding the loans made to Niebur and Hough by stating that Farmland loaned money to "third party farmers" without disclosing that Niebur and Hough were related parties.

15.    On August 1, 2019, Plaintiff's counsel sent a litigation demand (the "Demand") to Farmland Partners' Board demanding that it investigate the wrongdoing outlined above and in this complaint and bring all appropriate legal action against any offending officer, director, or other person or entity who is found to have committed or participated in the wrongdoing described herein. A copy of the Demand is attached hereto and made part hereof as Exhibit A.

16.    Over a month later, on September 10, 2019, defense counsel responded to the Demand by asking Plaintiff to provide proof of Plaintiff's FPI holdings, which Plaintiff promptly provided on September 16, 2019.

17.    In what can only be considered a move to protect themselves, the Individual Defendants have provided no substantive response to Plaintiff's Demand.

18.    In light of the Board's constructive refusal to act, Plaintiff brings this action to remedy the harm caused by the Individual Defendants' wrongful actions.

**JURISDICTION AND VENUE**

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

20.     This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in, maintains executive offices in, or is incorporated in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of their duties owed to Farmland Partners, occurred in this District; and/or (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

23.     Plaintiff has continuously been a Farmland Partners stockholder since February 2016.

24.     Nominal Defendant Farmland Partners is a Maryland corporation with principal executive offices located at 4600 South Syracuse Street, Suite 1450, Denver, Colorado. Farmland Partners is a REIT that manages a portfolio of farmland and land with agricultural development potential spanning approximately 162,000 acres across seventeen states. Substantially all of the Company's assets and operations are held by and conducted through its consolidated subsidiaries, including Farmland Partners Operating Partnership, L.P. (the "Operating Partnership"). Farmland Partners is the sole member of the Operating Partnership's general partner, and owned 93.2% of the Operating Partnership's outstanding common units as of March 15, 2019. As of March 8, 2019, Farmland Partners had thirteen employees.

25.     Defendant Pittman is Farmland Partners' President and CEO, and has been since May 2018, and April 2014, respectively. Defendant Pittman is also a Farmland Partners' director and has been since April 2014. Defendant Pittman was also Farmland Partners' President from April 2014 to February 2017. Farmland Partners paid defendant Pittman the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2018 | $477,000 | - | $599,997 | $23,468 | $1,100,465 |
| 2017 | $477,000 | - | $648,852 | $62,694 | $1,188,546 |
| 2016 | $477,000 | $500,000 | $648,852 | $50,357 | $1,676,209 |
| 2015 | $432,083 | $300,000 | $650,000 | $42,755 | $1,424,838 |

26.     Defendant Fabbri is Farmland Partners' CFO and Treasurer and has been since April 2014. Defendant Fabbri was also Farmland Partners' Secretary from April 2014 to at least November 2016. Farmland Partners paid defendant Fabbri the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2018 | $275,000 | $122,472 | $249,999 | $5,713 | $653,184 |
| 2017 | $275,000 | - | $149,733 | $14,616 | $439,349 |
| 2016 | $275,000 | $250,000 | $149,733 | $20,678 | $695,411 |
| 2015 | $251,667 | $100,000 | $260,000 | $17,946 | $629,613 |

27.    Defendant Chris A. Downey ("Downey") is Farmland Partners' Lead Independent Director and has been since at least April 2016.  He has been a director since April 2014. Defendant Downey is also the Chairman of Farmland Partners' Audit Committee and has been since at least March 2015.

28.    Defendant Bartels is a Farmland Partners director and has been since April 2014. Defendant Bartels is also a member of Farmland Partners' Audit Committee and has been since at least March 2015. During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bartels made the following sales of Company stock:

| Name | Price | Amount | Value | Date |
|------|-------|--------|-------|------|
| Bartels | $8.11 | 250 | $2,027.50 | 5/18/2018 |
| Bartels | $7.92 | 1,708 | $13,527.36 | 5/16/2018 |
| Bartels | $7.93 | 1,292 | $10,245.56 | 5/16/2018 |
| Bartels | $7.92 | 200 | $1,584 | 5/16/2018 |
| Bartels | $8.24 | 500 | $4,120 | 3/27/2018 |
| Bartels | $8.23 | 2,500 | $20,575 | 3/26/2018 |
| Bartels | $8.31 | 1,500 | $12,465 | 3/9/2018 |
| **Total** | | | | **$64,544.42** |

29.    Defendant Joseph W. Glauber ("Glauber") is a Farmland Partners director and has been since February 2015. Defendant Glauber is also a member of Farmland Partners' Audit Committee and has been since at least April 2016. 34.

30.     Defendant John A. Good ("Good") is a Farmland Partners director and has been since January 2018.

31.     Defendant Robert L. Cowan ("Cowan") was Farmland Partners' President from February 2017 to May 2018. Farmland Partners paid defendant Cowan the following compensation as an executive:

| Year | Salary | Bonus | All Other Compensation | Total |
|------|--------|-------|------------------------|-------|
| 2017 | $300,000 | $165,000 | $33,523 | $498,523 |

32.     Defendant Darell D. Sarff ("Sarff") was a Farmland Partners director from April 2014 to January 2018.

33.     Defendant John C. Conrad ("Conrad") was a Farmland Partners director from March 2016 to August 2017.

34.     Defendant Thomas S.T. Gimbel ("Gimbel") was a Farmland Partners director from February 2017 to May 2018.

35.     Defendant Boardman was a Farmland Partners director from February 2017 to December 2017. During the period of time when the Individual Defendants materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Boardman made the following sales of Company stock:

| Name | Price | Amount | Value | Date |
|------|-------|--------|-------|------|
| Boardman | $9.86 | 20,000 | $197,200 | 6/1/2017 |
| Boardman | $9.84 | 65,422 | $643,752.48 | 5/30/2017 |
| Boardman | $9.96 | 1,483 | $14,770.68 | 5/16/2017 |
| Boardman | $11.35 | 21,272 | $241,437.20 | 3/1/2017 |
| **Total** | | | | **$1,097,160.36** |

36.     Collectively, the defendants identified in ¶¶25-35 are referred to herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

37.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Farmland Partners were required to, among other things:

a. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b. conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c. properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d. remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e. ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

40. Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41. In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code") that applies to all employees, including officers and members of the Board. The Code states that it "is designed to promote," among other things, "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships." As to these conflicts of interest, the Code states:

> **Conflicts of Interest**
>
> A conflict of interest arises any time the personal interests of Company Personnel interfere with his, her or their ability to act in the best interests of the Company. All Company Personnel must discharge their responsibilities on the basis of what is in the best interest of the Company independent of personal considerations or relationships.
>
> Company Personnel must disclose any potential conflicts of interest to the Chief Financial Officer or such officer's designees, who can advise the employee as to whether or not the Company believes a conflict of interest exists. Conflicts of interest may not always be clearcut, so Company Personnel are encouraged to bring questions about particular situations to the Chief Financial Officer or such officer's designees. Company Personnel should also disclose potential conflicts of interest involving the employee's spouse, siblings, parents, in-laws, children, life partner and members of the employee's household.
>
> Conflicts of interest involving any member of the Board of Directors shall be addressed (i) by the Board of Directors or applicable committee thereof

in accordance with policies and procedures followed by the Board of Directors from time to time, and (ii) in a manner that is consistent with the discharge by the members of the Board of Directors of their fiduciary duties'

42.     Farmland Partners has also adopted a "Code of Ethics for Chief Executive Officer and Senior Financial Officers," as of September 18, 2015 (the "Code of Ethics"). The Code of Ethics states that "[t]he Chief Executive Officer and Senior Financial Officers will exhibit and promote the highest standards of honest and ethical conduct." The Code of Ethics states that they shall:

- Conduct Company business in an ethical, moral and legal manner.

- Encourage and reward professional integrity in all aspects of the organization, including by eliminating inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal or alienation.

- Seek to avoid, eliminate and/or prevent the appearance or occurrence of conflicts of interest between what is in the best interest of the Company and what could result in material personal gain for a member of the organization, including the Chief Executive Officer and Senior Financial Officers.

- Work together and with others in the Company in order to provide a mechanism for members of the organization to inform senior management of deviations in practice from policies and procedures governing honest and ethical behavior.

- Demonstrate their personal support for honest and ethical conduct through periodic communication throughout the organization regarding the importance of such conduct to the Company.

43.     The Code of Ethics also has a specific provision for records and reports, which states that they will "manage the Company's transaction and reporting system and procedures, records and public disclosures" such that transactions are "properly authorized" and accurately recorded in accordance with GAAP.

44. The Code of Ethics also states they shall "establish and maintain mechanisms to" among other things: (i) monitor and promote compliance with applicable laws; (ii) "[i]dentify, report ... and correct in a swift and certain manner, any detected deviations from applicable [laws], or [the] Code of Ethics"; and (iii) hold individuals accountable for deviations from applicable laws or the Code of Ethics.

45. Additionally, under the Audit Committee Charter defendants Downey, Bartels, and Glauber as Audit Committee members during the Relevant Period (the "Audit Committee Defendants") owed specific duties to Farmland Partners to assist the Board in overseeing the Company's internal audit function, integrity of its financial statements, and system of internal controls. Assisting the Board's oversight over those internal controls extends to, "assur[ing] that there is in place an effective system of internal controls reasonably designed to ... [s]afeguard the assets and income of the Company" and "[m]aintain compliance with the Company's ethical standards, policies, plans and procedures, and with laws and regulations." Moreover, the Audit Committee's Charter provides the Audit Committee is responsible for reviewing all related-party transactions. In addition, the Audit Committee Charter provides:

> The Committee shall also review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"), the New York Stock Exchange (the "NYSE"), and the applicable rules and regulations of the Securities and Exchange Commission (the "SEC").

46. Furthermore, the Company's latest DEF 14A filed with the SEC on March 21, 2019 (the "2019 Proxy"), and issued by the Board, which included defendants Bartels, Downey, Glauber, Good and Pittman, stated:

**Role of the Board in Risk Oversight**

One of the key functions of the Board is informed oversight of our risk management process. The Board administers this oversight function directly, with support from its three standing committees—the Audit Committee, the Nominating and Corporate Governance Committee and the Compensation Committee—each of which addresses risks specific to their respective areas of oversight. In particular, our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our Nominating and Corporate Governance Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

47. The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the following breaches of fiduciary duty and other violations of law.

## SUBSTANTIVE ALLEGATIONS

### COMPANY BACKGROUND

48. FPI is purportedly an internally managed, publicly traded (NYSE: FPI) real estate company that owns and seeks to acquire high-quality farmland throughout North America.

49. Farmland Partners is based in Denver, Colorado. Its common stock trades on the NYSE under the ticker symbol "FPI", and its Series B preferred stock trades on the NYSE under the ticker symbol "FPI.B".

50. As of March 13, 2019, Farmland Partners owned or had under contract over 162,000 acres located in Alabama, Arkansas, California, Colorado, Florida, Georgia, Illinois,

Kansas, Louisiana, Michigan, Mississippi, Nebraska, North Carolina, South Carolina, South Dakota, Texas, and Virginia. This land is currently being farmed by over 125 tenants who grow more than 30 major commercial crops.

51. On August 27, 2015, the Company announced the launch of the FPI Loan Program, an agricultural lending product aimed at farmers, as a complement to the Company's current business of acquiring and owning farmland and leasing it to farmers. Under the FPI Loan Program, the Company would originate loans secured by farm real estate, with most loans expected to be in principal amounts ranging from $500,000 to $5.0 million at fixed interest rates and maturities of up to two years.

52. Unbeknownst to shareholders, the Individual Defendants used the FPI Loan Program to line the pockets of their friends instead of farmers in need.

**FARMLAND PARTNERS WAS REQUIRED TO DISCLOSE RELATED-PARTY TRANSACTIONS**

53. A related-party transaction is a deal or arrangement between two parties who are joined by a preexisting business relationship or common interest.

54. GAAP requires corporations to include disclosures and descriptions of "related party transactions," including the nature of the relationship of the parties. Accounting Standards Codification 850-10-50 ("ASC 850"). GAAP, and specifically FASB Accounting Standards Codification 850-10-20 ("ASC 850"), defines a related parties as those "with which the entity may deal if one party controls *or can significantly influence the management or operating policies* of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." ASC 850-10-20.

55.     Additionally, the SEC requires that publicly traded companies disclose all transactions with related parties—such as executives, associates, and family members—in their quarterly reports and annual reports.

**HOUGH IS CONSIDERED A RELATED PARTY UNDER GOVERNING LAW**

56.     Hough is defendant Pittman's long-time business partner, who, in addition to cofounding Farmland Partners, also played a significant role in the Company's management. In 2012, Hough and defendant Pittman merged their personal farmland holdings to form Pittman Hough Farms LLC ("Pittman Hough Farms").

57.     Defendant Pittman owned a 75% interest in Pittman Hough Farms while Hough and his family members owned the remaining 25%. In 2014, defendant Pittman and Hough spun the majority of their holdings in Pittman Hough Farms into Farmland Partners, which held its initial public offering ("IPO") in the same year.

58.     On April 11, 2014, Farmland Partners held its IPO of 3.8 million shares at $13 per share. The Company had only two employees at the time of the IPO with Hough acting as a consultant to the Company.

59.     The Company has always represented that Hough is invaluable to FPI. In that vein, FPI stated in its April 2014 IPO prospectus (the "IPO Prospectus") that as a consultant Hough would advise FPI on "business strategies and related matters, including asset underwriting, asset acquisitions and accounting matters"

60.     At the time of the IPO, Farmland Partners' business was strictly renting farmland to farmers. More often than not, however, this landlord-tenant relationship included Hough.

61. Farmland Partners' IPO Prospectus provides that all of the Company's farms (except two) were rented to and operated by entities in which Hough held an interest, including Astoria Farms and Hough Farms. Astoria Farms was a partnership in which Pittman Hough Farms held a 33% partnership interest, Hough owned a 4.3% indirect interest, and limited partnerships in which defendant Pittman was the general partner owned the remaining interest. As for Hough Farms (a different entity than Pittman Hough Farms), defendant Pittman and Hough each held indirect partnership interests of 18.75% and 28.3%, respectively.

62. Farmland Partners' IPO Prospectus even recognizes Astoria Farms and Hough Farms as related parties. The IPO Prospectus explained that Hough Farms was related because Hough held an interest in the entity and would provide consultancy services to the Company. Specifically, the IPO Prospectus stated:

> Our principal source of revenue will be rent from tenants that conduct farming operations on our farmland. Upon completion of this offering, substantially all of the farmland in our initial portfolio will be leased to either Astoria Farms, which is controlled by Paul A. Pittman, our Executive Chairman, President and Chief Executive Officer, or ***Hough Farms***, in which Mr. Pittman and Jesse J. ***Hough, who will provide consulting services to us, have an interest***. See "Our Business and Properties-Description of Tenants." We refer to Astoria Farms and Hough Farms as our "related tenants" in this prospectus.

(Emphasis added).

63. Further cementing Hough's related party status, Farmland Partners' IPO Prospectus treated Hough like a part of management, laying out his experience, expertise, and ownership. Specifically, the IPO Prospectus stated:

> Mr. Pittman, our Executive Chairman, President and Chief Executive Officer, and Luca Fabbri, our Chief Financial Officer, comprise our management team. In addition, ***effective upon completion of this offering, we will enter into a consulting agreement with Jesse J. Hough, or the***

> *Consulting Agreement, pursuant to which Mr. Hough will advise us with respect to business strategies and related matters, including asset underwriting, asset acquisitions and accounting matters, as well as other matters reasonably requested by us during the term of the Consulting Agreement*. See "Management-Consulting Agreement." Mr. Hough was previously a partner of Kennedy and Coe, a top 100 accounting firm that focuses on agribusiness accounting, and has worked with Mr. Pittman since late 2011, when Messrs. Pittman and Hough agreed to merge their respective farmland and farming operations holdings. See "Our Business and Properties-Our Real Estate Experience." Messrs. Pittman, Fabbri and Hough have more than ten, three and ten years of experience, respectively, as owners of agricultural real estate and operators of farming businesses and collectively have consummated over 70 transactions to acquire and consolidate various farmland parcels. As a result, we believe Messrs. Pittman, Fabbri and Hough have a deeper understanding of agribusiness fundamentals and greater insight into factors affecting the value of farmland than many of our competitors. Upon completion of this offering and the formation transactions, ***Mr. Pittman and Mr. Hough will own approximately 26.3% and 5.2%, respectively,*** of the fully diluted equity interests in our company, which we believe aligns their interests with those of our stockholders.

(Emphasis added).

64.     Moreover, Farmland Partners considered Hough so important that the IPO Prospectus warned that losing him could have a material adverse effect on the Company's business.

65.     Finally, FPI basically admitted Hough was a related party, stating it was "dependent" on Hough and acknowledged that his consultancy agreement was not negotiated at arm's-length. Specifically, the IPO Prospectus stated:

> ***The loss of key management personnel, particularly Paul A. Pittman and Luca Fabbri, or the loss of Jesse J, Hough, our consultant, could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives.***
>
> Our future success depends to a significant extent on the continued service and coordination of our senior management team, particularly Paul A. Pittman, our Executive Chairman, President and Chief Executive Officer,

and Luca Fabbri, our Chief Financial Officer. We can provide no assurances that any of our key personnel will continue their employment with us. The loss of services of any of our executive officers could have a material adverse effect on our ability to implement our business strategy and to achieve our investment objectives.

In addition, the success of the farm operator that will rent substantially all of our properties upon completion of this offering depends to a significant extent on the continued service of Jesse J. Hough, who manages the farming operations of our related tenants that will lease substantially all of the farms in our initial portfolio. ***The loss of services from Mr. Hough under the Consulting Agreement or his departure from or diminishment of his activities at our related tenants could have a material adverse effect on our business.***

***

The FP Land Merger Agreement, the Shared Services Agreement, the Consulting Agreement and certain other agreements entered into in connection with the formation transactions were not negotiated on an arm's-length basis, and we may pursue less vigorous enforcement of terms of those agreements because of conflicts of interest and our dependence on Messrs. Pittman, Fabbri and Hough.

(Emphasis added).

66.     Hough went on to serve as a consultant for Farmland Partners for approximately four years, until April 2018.

67.     In addition to holding and sharing business interests in the entities described above (*i.e.,* Pittman Hough Farms, Astoria Farms, and Hough Farms), Hough and defendant Pittman were served as officers and directors at Wyoming entity, Pine Ridge, that is connected to the FPI Loan Program. Hough and defendant Pittman are named as officers and directors in each of Pine Ridge's annual reports since 2013 except defendant Pittman does not appear as an officer and director of Pine Ridge in 2017. But in 2018, Pine Ridge again listed Hough and defendant Pittman as officers and directors in its application to transact business in Nebraska.

68.     In fact, Pine Ridge is linked to one of the FPI's loans to Hough. As described more fully below, on August 25, 2017, the Company issued a $669,000 loan to Hough. The $669,000 loan was secured by a property in Nebraska.

69.     Three months earlier, on May 25, 2017, Hough Farms and Pine Ridge were listed as co-borrowers on a deed of trust for a loan from a bank. The bank loan was secured by the same Nebraska property that secured Farmland Partners' $669,000 loan to Hough.

70.     On October 2, 2017, the bank re-conveyed the deed of trust, indicating that Hough Farms and Pine Ridge had paid the May 25, 2017 loan. It seems that Farmland Partners' August 25, 2017 loan was used by Hough to repay the May 25, 2017 loan on behalf of Hough Farms and Pine Ridge. It further appears that Farmland Partners issued the $669,000 loan to Hough, despite the fact that the Nebraska property was already securing another loan for Pine Ridge (for which defendant Pittman was a fiduciary from 2013 to 2016, as well as in 2018).

71.     Hough and defendant Pittman also owned 25% and 5% interests, respectively, in American Agriculture Corporation, a Colorado corporation, until December 31, 2015. In addition, the Company's CFO, defendant Fabbri, served alongside Hough and defendant Pittman as American Agriculture Corporation's senior vice president.

72.     Given their inextricably woven business relationship, and the admissions contained in the IPO Prospectus that Hough was integral to the Company, it is undeniable that Hough is a related party under ASC 850.

**NIEBUR IS ALSO A RELATED PARTY UNDER GOVERNING LAW**

73.     Niebur is a former Company employee and close associate of defendants Pittman and Fabbri.  On its website in 2015, Farmland Partners listed Niebur as part of its management

team under the title "Farm Manager (High Plains, Mountains)." The following year, Farmland Partners named Niebur the Company's "Director of Acquisitions & Management - High Plains."

74. Farmland Partners continued to hold Niebur out as part of its management team in a 2017 presentation on the Company's investor relations website. Specifically, the Company's presentation stated:

> **Ryan Niebur**, Farm Manager (High Plains, Mountains)
>
> Ryan is a fourth generation farmer from Eastern Colorado. After college, Ryan began his career by returning to his roots where he started his own family farm and agricultural retail business (Tri-County Ag Inc.). Although Ryan has pursued other interests in the agricultural industry, he still is involved in the daily operations of his family farm. He attended Colorado State University where he received a B.S. in Business Marketing.

75. In addition, Niebur's Linkedin profile states that he worked at Farmland Partners as "Director of Acquisitions I Farm Manager I Realtor" from September 2015 until January 2018.

76. Niebur's status as a related party is further confirmed given that FPI has such few employees. It is undeniable that Niebur worked closely with FPI's management team. Due to this intimate work environment and in light of Niebur's important role as Director of Acquisitions, Niebur and the Company's management had significant influence over one another.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE RISKY RELATED-PARTY LOANS TO NIEBUR AND HOUGH THROUGH THE LOAN PROGRAM**

77. On August 27, 2015, the Company issued a press release announcing the FPI Loan Program. In the press release, the Individual Defendants described the FPI Loan Program as "an agricultural lending product aimed at farmers" that would "complement" Farmland Partners' business of acquiring and renting farmland. The Individual Defendants went on to

explain that the program "addresses a market need created by short term cash flow pressure on farmers who otherwise maintain solid balance sheets." The Individual Defendants assured investors that it would leverage its existing operational infrastructure to perform loan underwriting quickly to meet borrowers' funding needs, while adopting conservative loan-to-value criteria to ensure principal protection.

78.     Contrary to the Individual Defendants' claim, however, there was no "market need created by short term cash flow pressure on farmers," and instead only a few unrelated individuals sought loans under the program. The FPI Loan Program's primary beneficiaries were Niebur and Hough. In fact, at least five out of the total nine loans under the FPI Loan Program went to Hough and Niebur, accounting for $9.2 million, or 70%, of the total $15.4 million worth of loans issued under the FPI Loan Program.

79.     Although Farmland Partners listed the amounts of each of its nine loans in its public filings with the SEC, the Individual Defendants omitted the identities of the borrowers, including the names of Hough and Niebur, thereby concealing the Company's loans as third-party transactions. As a result, the Individual Defendants carefully hid that these related-party loans were not negotiated at arm's-length and therefore presented increased risks to Farmland Partners.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE RISKY UNDISCLOSED LOANS TO NIEBUR**

80.     Beginning in 2015, the Individual Defendants caused Farmland Partners to enter into a variety of risky loan transactions with Niebur due to his inability to meet his financial obligations to the Company.

81.     On January 26, 2018, Niebur and his wife, Stacie Niebur, filed a bankruptcy petition under Chapter 12 in the U.S. Bankruptcy Court for the District of Colorado, which lists Farmland Partners as a creditor. As described below, Niebur's bankruptcy filings and other public records, including deeds, detail the unflattering truth about the FPI Loan Program.

82.     In fact, on May 24, 2018, affiliates of Farmland Partners filed an objection to Niebur's proposed bankruptcy plan of reorganization, which sought to assign the Company's farmland leases to another entity controlled by Niebur. Farmland Partners objected to the assignment based in part on the assertion that the debtors, - Niebur, his wife, and Niebur's company, - failed to demonstrate their ability to satisfy the payments under the proposed plan. The objection, filed less than two months prior to the press release on May 24, 2018, shows that defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good knew Niebur's loans would not perform well for the Company.

83.     Loans to Niebur start on October 30, 2015, wherein Farmland Partners loaned $980,000 to an undisclosed borrower subsequently revealed to be Niebur. In public filings, Farmland Partners stated that the $980,000 loan was collateralized by a mortgage on farm real estate, and that its first year's interest was due up front. Compounding the fact that they omitted Niebur's identity as the borrower and his related party status, the Individual Defendants also concealed that the loan would be used to pay off an existing mortgage with a bank rather than for the FPI Loan Program's claimed purpose of farming operations. Niebur ended up defaulting on this loan.

84.     On March 16, 2017, Farmland Partners acquired the property used to collateralize Niebur's first loan, Andersons Farm, for $801,800. Andersons Farm's deed specifically provides

that Niebur defaulted on his first loan and was required to pay a remaining balance of $240,000. Court records from Niebur's bankruptcy reveal the remaining $240,000 obligation is collateralized by a property worth only $ 192,000, resulting in a loan-to-value ratio of 125% and running counter to the Individual Defendants' claim to investors that the FPI Loan Program's loan-to-value ratios would be "conservative" in nature.

85.     Despite Niebur defaulting on his previous obligation to the Company, the Individual Defendants, obviously influenced by his ongoing position with the Company, carelessly proceeded to lend him even more money.

86.     On May 10, 2017, the Individual Defendants disclosed Niebur's new loan (but not his identity), in the Company's Quarterly Report on Form 10-Q for the period ended March 31,2017 (the "Q1 2017 Form 10-Q") filed with the SEC. The Q1 2017 Form 10-Q disclosed that the previous $980,000 loan had been "renegotiated" into a new $2.194 million loan collateralized by two additional properties in Colorado. In addition to concealing Niebur's identity, the Q1 2017 Form 10-Q also omitted the fact that the undisclosed borrower had defaulted on Farmland Partners' initial loan, resulting in the need for the "renegotiation."

87.     Further, Farmland Partners' new $2.194 million loan to Niebur was, in reality, an acquisition of all three properties collateralizing Niebur's loans. On the same day, Farmland Partners acquired Andersons Farm for $801,800, the Company also acquired two additional properties from Niebur for $1.392 million. The cumulative acquisition price of these three properties is $2.194 million, the same amount as Niebur's second loan.

88.     Niebur's bankruptcy records further support the truth that this loan was actually an acquisition. Niebur lists Farmland Partners as a creditor with respect to the $240,000

obligation, yet the $2.194 million loan is entirely omitted from Niebur's bankruptcy records. As further indicated by the bankruptcy records, Niebur and Farmland Partners shared an understanding that Niebur would never pay back the principal, let alone any interest.

89.    The Individual Defendants also lent, but did not disclose to investors, an additional $68,000 to Niebur as a Company tenant. Farmland Partners issued this loan to Niebur so that he could fulfill his rent obligation on a new lease with the Company. According to Niebur's bankruptcy records, he signed a new lease agreement with Farmland Partners on March 15, 2017, which required his first annual rental payment of $61,750, by March 16, 2017.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUES UNDISCLOSED LOANS TO HOUGH THROUGH THE LOAN PROGRAM**

90.    The Individual Defendants also allowed Hough to profit from the Company. Farmland Partners' related-party lending continued with at least three loans worth approximately $6 million to Hough or entities affiliated with Hough.

91.    First, on July 25, 2017, Farmland Partners loaned $100,000 to Hough through PHS Holdings LLC ("PHS Holdings"), an entity designated as a related party in the Company's IPO Prospectus. The loan was secured by a property in Nebraska, with the deed of trust naming PHS Holdings as the trustor and with Hough signing as the entity's manager.

92.    Then, just one month later, on August 25, 2017, the Company loaned Hough an additional $669,000 through Hough Farms. Hough signed the deed of trust as Hough Farm's general partner.

93.    Much like the loans to Niebur, the loans to Hough were risky. Hough defaulted on the $100,000 loan made on July 25, 2017. Farmland Partners acquired the property securing the loan, but then the Company lent Hough even more money despite his default. The deed from the

Nebraska property shows that Hough (via PHS Holdings) conveyed the property to Farmland Partners on January 12, 2018. As was the case when Niebur defaulted, Farmland Partners simply acquired the property collateralizing the loan and considered the matter settled. The Company's Quarterly Report on Form 10-Q for the period ended March 31, 2018 (the "Q1 2018 Form 10-Q") filed with the SEC on May 10, 2018, provides that the loan "was fully settled ... on the maturity date of January 1, 2018." However, the Q1 2018 Form 10-Q also lists January 31, 2018, as the maturity date.

94.    On January 18, 2018, just six days after Farmland Partners acquired the Nebraska property due to Hough's default, the Individual Defendants loaned Hough an additional $5.25 million via Siffring Farms, more than doubling the money under the FPI Loan Program from $4 million to $9.25 million. Hough signed the deed of trust for the loan as Siffring Farms' president, even though Siffring Farms is an inactive limited liability company whose president is supposedly Duane Siffring.

95.    It appears Hough used the $5.25 million loan, at least in part, to pay off his outstanding $669,000 obligation to Farmland Partners. According to the Q1 2018 Form 10-Q, Hough's $669,000 loan was settled on February 2, 2018, less than one month after Farmland Partners loaned him the additional $5.25 million.

96.    Although the Company's loans to Niebur and Hough allowed the FPI Loan Program to appear as if it was growing, they produced no real benefit and ultimately were detrimental to the Company. Through these loans, the Individual Defendants were able to record notes receivable and provide a false impression of a working loan program. In reality, these loans were risky and added no value to Farmland Partners. Moreover, they were detrimental to the

Company. First, these related-party loans represent a significant lost opportunity cost given the monies provided to insiders Niebur and Hough could have been used elsewhere, and likely profitably. In addition, Farmland Partners may never receive repayment from Niebur in light of his bankruptcy. Further, the Company's reputation was severely damaged when the Individual Defendants' related-party loan scheme was revealed to the public.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO FALSE AND MISLEADING STATEMENTS**

97.     During the Relevant Period, the Individual Defendants made or caused Farmland Partners to disseminate a series of false and misleading statements concerning the FPI Loan Program in public filings with the SEC. Specifically, the Individual Defendants repeatedly claimed Farmland Partners granted loans to "third-party farmers" while issuing undisclosed loans to at least two related parties. The Individual Defendants also repeatedly emphasized the due diligence conducted in connection with issuing loans despite knowledge of their failure to properly vet related-party borrowers. In addition, the Individual Defendants caused or allowed the Company to misrepresent its compliance with GAAP and the effectiveness of its internal controls.

98.     On November 12, 2015, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2015 (the "Q3 2015 Form l0-Q") with the SEC. The Q3 2015 Form 10-Q falsely claimed it was meant for "third-party farmers," when in actuality it was being used to lend a majority of its funds to related parties.  Further, the Q3 2015 Form 10-Q mischaracterized the FPI Loan Program as a "complement" to the Company's core business of leasing farmland. This was clearly not true as applied to the related party transactions described herein.  In particular, the Company stated:

*FPI Loan Program*

In August 2015, the Company announced the launch of the FPI Loan Program, an agricultural lending product aimed at farmers, as a complement to the Company's current business of acquiring and owning farmland and leasing it to farmers. Under the FPI Loan Program, *we intend to make loans to third-party farmers* (both tenant and nontenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

(Emphasis added).

99.     Although the Q3 2015 Form 10-Q disclosed related-party transactions, which included those of Hough and defendant Pittman, the Individual Defendants concealed the October 2015 loan to Niebur, also a related party. In particular, the Q3 2015 Form 10-Q stated the following about related-party transactions:

**Note 4-Related Party Transactions**

\*\*\*

As of September 30, 2015, 11% of the acres in the Company's farm portfolio was rented to and operated by Astoria Farms or Hough Farms, both of which are related parties. Astoria Farms is a partnership in which Pittman Hough Farms LLC ("Pittman Hough Farms"), which is 75% owned by Mr. Pittman, has a 33.34% interest. The balance of Astoria Farms is held by limited partnerships in which Mr. Pittman is the general partner. Hough Farms is a partnership in which Pittman Hough Farms has a 25% interest. The aggregate rent recognized by the Company for these entities for the three and nine months ended September 30, 2015 was $685,005 and $2,035,752, respectively, and was $618,710 and $1,856,129 for the three and nine months ended September 30, 2014, respectively. As of September 30, 2015 and December 31, 2014, the Company had accounts receivable from these entities of $380,122 and $182,763, respectively.

For the three and nine months ended September 30, 2014, Pittman Hough Farms incurred $0 and $219,597, respectively, in professional fees on behalf of the Company. No such amounts were incurred for the three and nine months ended September 30, 2015.

American Agriculture Corporation ("American Agriculture") is a Colorado corporation that is 75% owned by Mr. Pittman and 25% owned by Jesse J. Hough, who provides consulting services to the Company. On April 16, 2014, the Company entered into a shared services agreement with American Agriculture pursuant to which the Company paid American Agriculture an annual fee of $175,000 in equal quarterly installments in exchange for management and accounting services. The agreement was terminated effective as of December 31, 20l4, by mutual agreement of both parties.

100.     Though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction in accordance with ASC 850-10-50, the Individual Defendants falsely represented the Q3 2015 Form 10-Q's compliance with GAAP. In particular, the Q3 2015 Form 10-Q stated:

The accompanying combined consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

101.     Further, the Q3 2015 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q3 2015 Form 10-Q contained the signed certifications of defendants Pittman and Fabbri pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

102.     On March 15, 2016, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K") with the SEC, which was signed by

defendants Pittman, Fabbri, Downey, Bartels, Glauber, and Sarff. The 2015 Form 10-K again falsely represented the FPI Loan Program as being designed for third-party farmers. Specifically, the 2015 Form 10-K stated:

> **Under the FPI Loan Program, we intend to make loans to third-party farmers** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

(Emphasis added).

103.    In addition, the 2015 Form 10-K emphasized the due diligence that Farmland Partners conducted as a predicate to issuing loans. Specifically, the 2015 Form l0-K conveyed that Farmland Partners' potential debtors would be screened rigorously, meaning that loans would be granted based on "[the borrower's] willingness and ability to pay competitive ... rates." In reality, the Individual Defendants failed to properly screen related party borrowers, as indicated by several loans being renegotiated, defaulted, wrapped into new loans, or threatened by the borrower's eventual bankruptcy. As a result, the FPI Loan Program was not "highly complementary to and synergistic with [Farmland Partners'] core business of investing in farmland" as claimed in the 2015 Form 10-K. Instead, the FPI Loan Program was a liability for the Company. Expressly, the 2015 Form 10-K stated:

> In general, the tenant selection process focuses primarily on candidates' experience and reputation **based upon background and reference checks** of potential tenants, as well **as their willingness and ability to pay** competitive rental rates.
>
> ***
>
> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. **We believe that the business of making**

> *loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland.* We generally find potential borrowers during the process of sourcing farm acquisitions. *We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants.* The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

(Emphasis added).

104.    The 2015 Form 10-K also moderated the nature of the risks associated with the FPI Loan Program, stating the risks as those that are just "associated with being a lender." However, the FPI Loan Program was extremely risky for the Company far and beyond those traditionally associated with lending because the Individual Defendants caused the Company to grant undisclosed, perilous loans to related parties. Unlike transactions with third parties, these related party loans were not arm's-length transactions, were issued with more lenient underwriting standards, and presented an increased risk that the borrowers' indebtedness would be forgiven on the basis of their personal relationship. Specifically, the 2015 Form 10-K stated:

> *Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.*

(Emphasis added).

105.    Further, the FBI Loan Program presented a risk of reputational harm in the event the related party loans were revealed.

106.    Although the 2015 Form 10-K disclosed the $980,000 loan issued by the Company to Niebur, the Individual Defendants concealed Niebur's identity as the borrower and

his status as a related party borrower, giving investors the false impression that the loan was a third-party transaction. Specifically, the 2015 Form 10-K stated:

> On November 16, 2015, the Company entered into a promissory note agreement with a tenant farmer to provide $980,000 in the form of a mortgage note. The note has a fixed annual interest rate with principal and all accrued interest due at maturity on October 30, 2017. The note is collateralized by a first mortgage on farm real estate.

107.     Although the 2015 Form 10-K disclosed related party transactions, those disclosures omitted the October 2015 loan to Niebur.

108.     The 2015 Form 10-K further stated that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. In addition, the 2015 Form 10-K contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

109.     On May 10, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended March 31, 2016 (the "Q1 2016 Form 10-Q") with the SEC. The Q1 2016 Form 10-Q again once again falsely represented that the FPI Loan Program was for "third-party farmers" and in par with the Company's core business. In particular, the Q1 2016 Form 10-Q stated:

> In August 20l5, the Company introduced an agricultural lending product aimed at farmers as a ***complement*** to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). ***Under the FPI Loan Program, the Company makes loans to third-party farmers*** (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming

infrastructure projects, and for other farming and agricultural real estate related projects.

(Emphasis added).

110.     The Q1 2016 Form 10-Q again emphasized the due diligence that Farmland Partners conducted prior to issuing loans. Specifically, the Q1 2016 Form 10-Q stated:

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, perform due diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

111.     Again, the Q1 2016 Form 10-Q disclosed the $980,000 Niebur loan, but like before concealed Niebur's identity and his status as a related party borrower.

112.     The Q1 2016 Form 10-Q also provided a similar explanation of the Company's related party transactions contained in the 2015 Form 10-K.

113.     Even though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction as required by ASC 850-10-50, the Individual Defendants falsely represented the Q1 2016 Form 10-Q's compliance with GAAP. Specifically, the Q1 2016 Form 10-Q stated:

> The accompanying combined consolidated financial statements for the periods ended March 3l, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

114. Further, the Q1 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q1 2016 Form 10-Q again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

115. On May 10, 2016, the Company held an earnings call with analysts and investors, during which defendant Pittman represented that all of the Company's acquisitions were arm's-length transactions. Specifically, defendant Pittman stated: "Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgment of value."

116. On August 9, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended June 30, 2016 (the'Q2 2016 Form 10-Q") with the SEC. The Q2 2016 Form10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business. Specifically, the Q2 2016 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

117.     The Q2 2016 Form 10-Q again disclosed the $980,000 Niebur loan while concealing Niebur's identity and his status as a related party borrower.

118.     The Q2 2016 Form 10-Q also provided a similar disclosure of the Company's related party transactions as in the 2015 Form 10-K.

119.     Even though the Company failed to disclose the October 2015 loan to Niebur as a related party transaction as required by ASC 850-10-50, the Individual Defendants falsely represented the Q2 2016 Form 10-Q's compliance with GAAP. In particular, the Q2 2016 Form 10-Q stated:

> The accompanying combined consolidated financial statements for the periods ended June 30, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

120.     Further, the Q2 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q2 2016 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

121.     On November 7, 2016, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2016 (the "Q3 2016 Form 10-Q") with the SEC. The Q3 2016 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party

farmers" and complementary to the Company's core business. In particular, the Q3 2016 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

122. The Q3 2016 Form 10-Q again disclosed the $980,000 Niebur loan, but again concealed Niebur's identity and his status as a related party borrower.

123. The Q3 2016 Form 10-Q also provided a similar disclosure of the Company's related party transactions contained in the 2015 Form 10-K.

124. Even though the Company failed to disclose the October 2015 loan to Niebur as a related party transaction as required by ASC 850-10-50, the Individual Defendants falsely represented the Q3 2016 Form 10-Q's compliance with GAAP. Specifically, the Q3 2016 Form 10-Q stated:

> The accompanying combined consolidated financial statements for the periods ended September 30, 2016 and 2015 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

125. Further, the Q3 2016 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q3 2016 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy

of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

126.     On February 23, 2017, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, and signed by defendants Pittman, Fabbri, Downey, Bartels, Boardman, Conrad, Gimbel, Glauber, and Sarff. The 2016 Form 10-K again falsely stated that the FPI Loan Program was for "third-party farmers." Specifically, the 2016 Form 10-K stated:

> **Under the FPI Loan Program, we make loans to third-party farmers** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

(Emphasis added).

127.     The 2016 Form 10-K again emphasized the due diligence that Farmland Partners conducted prior to issuing loans. Specifically, the 2016 Form 10-K stated:

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. We believe that the business of making loans secured by mortgages on farmland. is highly complementary to, and synergistic with, our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential borrowers the same way we screen potential tenants. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

128. The 2016 Form 10-K continued to moderate the nature of the risks associated with the FPI Loan Program, stating as risks as ones just "associated with being a lender." Specifically, the 2016 Form 10-K stated:

> Under the FPI Loan Program, we provide loans to third-party farmers, which us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.

129. The 2016 Form 10-K again disclosed the $980,000 Niebur loan, but again concealed Niebur's identity and his status as a related party borrower.

130. The 2016 Form 10-K also provided a similar disclosure of the Company's related party transactions contained in the 2015 Form l0-K.

131. Even though the Company failed to disclose the October 2015 loan to Niebur as a related-party transaction as required by ASC 850-10-50, the Individual Defendants falsely represented the 2016 Form 10-K's compliance with GAAP. In particular, the 2016 Form 10-K stated:

> The accompanying consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

132. Further, the 2016 Form 10-K affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The 2016 Form 10-K once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the

reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

133. On May 10, 2017, Farmland Partners filed its Q1 2017 Form 10-Q with the SEC. The Q1 2017 Form 10-Q again falsely represented the FPI Loan Program as for "third-party farmers" and complementary to the Company's core business. In particular, the Q1 2017 Form 10-Q stated:

> In August 20l5, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

134. The Q1 2017 Form 10-Q, reported that Niebur's $980,000 loan had been "renegotiated." Moreover, the Individual Defendants disclosed that the Company had simultaneously issued a second loan for the far more substantial amount of $2.194 million. However, the Individual Defendants steadfastly failed to disclose that Niebur was a related party. The Q1 2017 Form 10-Q again failed to acknowledge Niebur's identity and related party designation. Specifically, the Q1 2017 Form 10-Q stated:

> The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

135. The Q1 2017 Form 10-Q's related party disclosures continued to omit the Company's October 2015 and March 2017 loans to Niebur.

136. Even though the Company failed to disclose its loans to Niebur as related party transactions as required by ASC 850-10-50, the Individual Defendants falsely represented the Q1 2017 Form 10-Q's compliance with GAAP. In particular, the Q1 2017 Form 10-Q stated: The accompanying consolidated financial statements for the periods ended March 37, 2017 and 2016 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

137. Further, the Q1 2017 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q1 2017 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

138. On July 21, 2017, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended June 30, 2017 (the "Q2 2017 Form 10-Q") with the SEC. The Q2 2017 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business. In particular, the Q2 2017 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

139.     The Q2 2017 Form 10-Q again disclosed the $980,000 Niebur loan, but again concealed Niebur's identity and his status as a related party borrower. The Q2 2017 Form 10-Q also disclosed the second $2.194 million Niebur loan, but similarly concealed his identity and status as a related party borrower.

140.     Although the 2Q 2017 Form 10-Q disclosed related party transactions, these disclosures failed to mention the October 2015 and March 2017 loans to Niebur.

141.     Even though the Company failed to disclose its loans to Niebur as related party transactions as required by ASC 850-10-50, the Individual Defendants falsely represented the Q2 2017 Form 10-Q's compliance with GAAP. Specifically, the Q2 2017 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended June 30, 2017 and 2016 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

142.     Further, the Q2 2017 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q2 2017 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

143.     On November 9, 2017, Farmland Partners filed its Quarterly Report on Form 10-Q for the period ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC. The Q3 2017 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party

farmers" and complementary to the Company's core business. In particular, the Q3 2017 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

144.    The Q3 2017 Form 10-Q again disclosed the $2.194 million Niebur loan while concealing his identity and status as a related party borrower. The Q3 2017 Form 10-Q also disclosed new loans to Hough for $100,000 and $669,000 while similarly hiding g Hough's identity and status as a related party borrower.

145.    Although the 3Q 2017 Form 10-Q disclosed related party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July and August 2017 loans to Hough in those disclosures.

146.    Even though the Company failed to disclose its loans to Niebur and Hough as related party transactions as required by ASC 850-10-50, the Individual Defendants falsely represented the Q3 2017 Form 10-Q's compliance with GAAP. In particular, the Q3 2017 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended September 30, 2017 and 2016 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

147.    Further, the Q3 2017 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal

control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q3 2017 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

148.    On March 5, 2018, Farmland Partners filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC, and signed by defendants Pittman, Fabbri, Downey, Bartels, Glauber, Good, and Gimbel. The 2017 Form 10-K again falsely stated that the Loan Program was for "third-party farmers." Specifically, the 2017 Form 10-K stated:

> **Under the FPI Loan Program, we make loans to third-party farmers** (both tenant and non-tenant) to provide partial financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related purposes.

(Emphasis added).

149.    The 2017 Form 10-K again emphasized the synergies provided by the FPI Loan Program while highlighting the due diligence that Farmland Partners conducted as a predicate to issuing loans. Specifically, the 2017 Form 10-K stated:

> *FPI Loan Program*
>
> We believe that our existing systems and personnel are well suited to source, diligence, close and manage loans under the FPI Loan Program at little or no additional cost to us. We believe that the business of making loans secured by mortgages on farmland is highly complementary to, and synergistic with, our core business of investing in farmland. We generally find potential borrowers during the process of sourcing farm acquisitions. We conduct due diligence on loan collateral the same way we conduct due diligence on potential farm acquisitions, and we screen potential

borrowers the same way we screen potential tenants. The FPI Loan Program offering gives us an increased visibility in the marketplace, thereby benefiting our core farmland investing business.

150.    The 2017 Form 10-K continued to moderate the nature of the risks associated with the FPI Loan Program, stating  those risks as just ones "associated with being a lender." Specifically, the 2017 Form 10-K stated:

Under the FPI Loan Program, we provide loans to third-party farmers, which exposes us to risks associated with being a lender, including the risk that borrowers default on their obligations to us, which could adversely affect our results of operations and financial condition.

151.    The 2017 Form 10-K again disclosed the $2.194 million loan, the $100,000 loan, and the $669,000 loan while concealing the identities of Niebur and Hough as the recipients of those loans and their statuses as related party borrowers.

152.    Although the 2017 Form 10-K disclosed related party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July and August 2017 loans to Hough in those disclosures.

153.    Even though the Company failed to disclose its loans to Niebur and Hough as related party transactions as required by ASC 850-10-50, the Individual Defendants falsely represented the 2017 Form 10-K's compliance with GAAP. In particular, the 2017 Form 10-K stated:

The accompanying consolidated financial statements are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

154.    Further, the 2017 Form 10-K affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal

control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The 2017 Form 10-K once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

155.    On May 10, 2018, Farmland Partners filed its Q1 2018 Form 10-Q with the SEC. The Q1 2018 Form 10-Q again falsely represented the FPI Loan Program as designed for "third-party farmers" and complementary to the Company's core business. In particular, the Q1 2018 Form 10-Q stated:

> In August 2015, the Company introduced an agricultural lending product aimed at farmers as a complement to the Company's business of acquiring and owning farmland and leasing it to farmers (the "FPI Loan Program"). Under the FPI Loan Program, the Company makes loans to third-party farmers (both tenant and nontenant) to provide financing for working capital requirements and operational farming activities, farming infrastructure projects, and for other farming and agricultural real estate related projects.

156.    The Q1 2018 Form 10-Q again disclosed the $2.194 million loan, the $100,000 loan, and the $669,000 loan while concealing the identities of Niebur and Hough as the recipients of the loans and their statuses as related party borrowers. As to Hough's loans for $100,000 and $669,000, the Q1 2018 Form 10-Q stated they were "fully settled." The Q1 2018 Form 10-Q also disclosed a new loan for $5.25 million to Hough without disclosing his identity and status as a related party borrower.

157.    Although the Q1 2018 Form 10-Q disclosed related party transactions, the Individual Defendants concealed the October 2015 and March 2017 loans to Niebur, and also omitted the July 2017, August 2017, and January 2018 loans to Hough in those disclosures.

158.    Even though the Company failed to disclose its loans to Niebur and Hough as related party transactions as required by ASC 850-10-50, the Individual Defendants falsely represented the Q1 2018 Form 10-Q's compliance with GAAP. In particular, the Q1 2018 Form 10-Q stated:

> The accompanying consolidated financial statements for the periods ended March 31, 2018 and 2017 are presented on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Company and the Operating Partnership.

159.    Further, the Q1 2018 Form 10-Q affirmed that the Company's internal control over financial reporting was effective and that there were no changes in the Company's internal control that materially affected, or were reasonably likely to materially effect, the Company's internal control over financial reporting. The Q1 2018 Form 10-Q once again contained the signed certifications of defendants Pittman and Fabbri pursuant to SOX attesting to the accuracy of the reported financial information, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

160.    The statements referenced above were each false and misleading when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

> a.   the individual Defendants were using the FPI Loan Program to issue loans mainly to related parties, not "third-party farmers";
>
> b.   these related party loans were issued without properly vetting the borrower's ability to pay, were not negotiated at arm's-length, reflected more lenient underwriting standards than those with third parties, and presented increased risks beyond those traditionally associated with being a lender;

c. the Company failed to disclose the loans to Niebur and Hough as related party transactions, as was required under GAAP;

d. Farmland Partners was inflating its revenue and earnings by issuing these loans to related party tenants who would then circle the money back to the Company in the form of rent payment; and

e. as a result of the foregoing, Farmland Partners' statements concerning the Company's financial results and future prospects, compliance with GAAP, and effectiveness of its internal controls were false and misleading.

THE TRUTH BEGINS TO EMERGE

161. During the course of the wrongdoing described above, several defendants questionably resigned from their positions at Farmland Partners, including the former President, defendant Cowan, and four former directors, defendants Conrad, Boardman, Sarff, and Gimbel.

162. During this same time period, the Company also dismissed its public accounting firm, PricewaterhouseCoopers LLP ("PwC").

163. On August 28, 2017, defendant Conrad resigned from the Board, reducing the number of Farmland Partners' directors from eight to seven.

164. On December 5, 2017, defendant Boardman resigned from the Board, further reducing the number of Farmland Partners' directors to six.

165. Less than a month later, on January 18, 2018, defendant Sarff resigned from the Board.

166. On January 23, 2018, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Sarff's resignation and simultaneously announcing defendant Good's appointment to the Board to fill defendant Sarff's vacancy.

167. On March 13, 2018, the Company filed a Current Report on Form 8-K announcing that it had dismissed PwC as its auditor on March 10, 2018 but gave non reason for its dismissal.

168. A few days later, on March 20, 2018, the Company filed a Current Report on Form 8-K with the SEC announcing defendant Gimbel's decision not to stand for reelection to the Board upon his term's expiration at the Company's 2018 Annual Meeting of Stockholders on May 2, 2018.

169. Less than a month later, on April 13, 2018, Farmland Partners filed a Current Report on Form 8-K with the SEC announcing the Company's entry into a separation agreement with defendant Cowan, explaining that he will "retire from his role as President of the Company effective May 31, 2018."

170. Although Farmland Partners maintains that they were not "the result of any disagreement with the Company," the resignations of defendants Conrad, Boardman, Sarff, Gimbel, and Cowan remain suspect given that they occurred leading up to and shortly after the Company's January 2018 loan to Hough in the amount of $5.25 million, which more than doubled the money loaned under the FPI Loan Program from $4 million to $9.25 million.

**THE TRUTH EMERGES**

171. On July 11, 2018, the charade about the Company's related party loans and questionable accounting came to light, as Rota Fortunae, the pseudonym of an investment analyst, published an extensive report on *Seeking Alpha* detailing the researcher's findings on Farmland Partners and the FPI Loan Program (the "Rota Fortunae Report"). The Rota Fortunae Report revealed for the first time that just two individuals, related parties Niebur and Hough,

received over 70% of the total money issued through the FPI Loan Program. The Rota Fortunae Report further exposed that several of these loans had defaulted, been renegotiated, wrapped into new loans, or were threatened by Niebur's bankruptcy. Specifically, the Rota Fortunae Report stated:

> While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now bankrupt tenant (not disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750.

> Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own.

> ***

> Niebur's [first] loan remained unchanged until the 1Q2017 10-Q (pg. 16) when FPI disclosed that it "renegotiated" the loan while simultaneously entering into a new $2.194 Million loan ... collateralized by two additional properties.... [A]nd in which the deed specifically states that Niebur was in default on the loan and obligated to pay a remaining balance....

172.    Indeed, the Rota Fortunae Report discussed the high probability of FPI playing "accounting games" to artificially inflate the Company's revenue. The report explained that Farmland Partners accomplished the revenue inflation by making loans to related-party recipients Niebur and Hough, both of whom circled the money back to the Company, which Farmland Partners then reported as rent and interest revenue. Specifically, the Rota Fortunae Report stated:

When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who roundtrip the cash back to FPI us rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.

And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.

173.    The Rota Fortunae Report further predicted an imminent cut in Farmland Partners' dividend, stating, "[w]ith only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency."

174.    Upon this information the Company's common stock plunged $3.37 per share, or nearly 39% to close at $5.28 per share on July 11, 2018, compared to the previous trading day's closing of $8.65 per share. The Company's preferred stock also fell $6.42 per share, or 26%, to close at $18.15 per share on July 1l, 2018, compared to the previous day's closing of $24.57 per share.

175.    In total, Farmland Partners' market capitalization of common and preferred stock plunged more than $110 million and $38 million, respectively, in a single day.

176.    On July 17, 2018, Farmland Partners at the direction of defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good, issued a press release purporting to refute the

report's claims. In the press release, defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good defended Niebur and Hough as not being related parties because they had no "decision-making authority." In particular, the press release stated:

> Neither Ryan Niebur nor Jesse Hough are "related parties" as defined by applicable rules of the SEC and the Financial Accounting Standards Board ('FASB) and were not "related parties" at the time of any loan made to them.
>
> ***
>
> Ryan Niebur was and is a tenant of the Company and he worked part-time for the Company as a farm manager from September 2015 to December 2017. Ryan Niebur was never a member of the Company's senior management team and never had corporate decision-making authority. He is not a "related party" under applicable SEC and FASB rules. We continue to believe the loans made to Ryan Niebur are good loans and will perform well for the Company.
>
> Jesse Hough was not a "related party" under applicable SEC and FASB rules at the time loans were made. Mr. Hough is a tenant and a borrower of the Company. From April 16, 2014 through April 16, 2018, Mr. Hough was a consultant of the Company. He was a business partner of FPI's Chairman and CEO, Paul Pittman, prior to the Company's initial public offering and during the first couple of years subsequent to the initial public offering. During the period Mr. Hough and Mr. Pittman remained business partners, the Company appropriately disclosed Mr. Pittman's relationship with Mr. Hough under the related party transactions disclosures in the Company's public filings (see, for example, "Note 4-Related Party Transactions" on pageF-17 of the Company's Annual Report on Form 10-K for the year ended December 31,2015). Mr. Hough never had decision-making authority over any matters or transactions involving the Company.

177. Contrary to the Company's position, however, under ASC 850, a related party is not defined as one with "decision making authority," but rather one who "can significantly influence the management or operating policies." Both Niebur and Hough meet this standard.

178. In fact, Judge Ebel, the judge in the Securities Class Action, applied this standard in denying the motion to dismiss finding that the plaintiffs sufficiently alleged "that Niebur and Hough were related parties during the relevant times."

179.     Also, in the July 17, 2018 press release, defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good declared their belief that "the loans made to Ryan Niebur are good loans and will perform well for the Company." Defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good knew this was not true, as revealed by Niebur's bankruptcy records.

180.     On July 18, 2018, *Seeking Alpha* published a report authored by "Beyond Saving" titled "Farmland Partners: The Smell Test." Beyond Saving argues that regardless of whether Farmland Partners was required to disclose the related party loans and regardless of their magnitude, the Company should have disclosed Niebur's bankruptcy because most REITs do and "shareholders should be informed." Specifically, Beyond Saving wrote:

> There are some issues that were not addressed by FPI, such as the Niebur bankruptcy. Niebur is a tenant and a borrower under the lending program, and FPI has counsel representing them in the bankruptcy. Even if the amounts at risk are minimal and the risk of either the leases or the loans being modified are slim, a bankruptcy is something that should be disclosed. Even if the tenant/borrower remains unnamed, I think shareholders should be informed. I do not make any claims as to whether or not FPI had a legal obligation to disclose it, but most REITs do disclose tenant bankruptcies even when they are not expected to impact rent. Hopefully, FPI will reconsider some of their disclosures and will seek to have better clarity moving forward.

181.     On July 24, 2018, in response to the Rota Fortunae Report, the Company filed a defamation lawsuit captioned, *Farmland Partners, Inc. v. Rota Fortunae*, No. 1:18-cv-02351-KLM (D. Col.), against Rota Fortunae (the "Defamation Lawsuit"). The Defamation Lawsuit alleges the following claims: (i) defamation; (ii) disparagement; (iii) intentional interference with prospective business relations; (iv) unjust enrichment; (v) deceptive trade practices; and (vi) civil conspiracy. The Defamation Lawsuit is currently pending.

182.    Less than one month after the Rota Fortunae Report, on August 8, 2018, Farmland Partners issued a press release announcing poor financial results for the second quarter ended June 30, 2018. The press release reported a net loss of $2.3 million compared to a net income of $0.8 million during the same period the previous year.

183.    Further, as predicted by the Rota Fortunae Report, the press release disclosed a cut in the Company's quarterly dividend.  Farmland Partners cut its dividend to $0.05 per share of common stock, representing a slash of more than 50%, compared to the Company's previous dividend of $0.1275 per share. Moreover, Farmland Partners lowered its 2018 earnings guidance by $0.10 per share to range of $0.30-0.34 per share. Finally, the press release announced the Board had authorized an additional $30 million in repurchases of Farmland Partners' common stock or Series B Perpetual Preferred Stock, to be financed by asset sales and dividend cuts.

184.    The next day, on August 9, 2018, the Company held an earnings call with analysts and investors to discuss Farmland Partners' second quarter 2018 results. Throughout the call, defendant Pittman blamed the Company's poor performance and dividend cuts on the Rota Fortunae Report. In addition to the claimed "lost revenue for new business ventures," defendant Pittman also blamed the report for "additional costs and expenses, including litigation expenses."

185.    Thus, defendant Pittman and the rest of the Individual Defendants failed to accept any accountability for their actions in failing to disclose the Company's related party transactions. Egregiously, defendant Pittman also informed stockholders that the Company would now bear the cost of litigating against Rota Fortunae.  Defendant Pittman stated:

> I would now like to touch briefly on the misleading anonymously written Seeking Alpha report. We issued a detailed press release refuting the allegations, so I will not go through the Seeking Alpha report point by

point. We have no intent on dwelling on this issue, we are instead focused on what it means for our shareholders and what we can do. We will pursue litigation and cooperate with law enforcement to see that justice is done and to attempt to recoup money for our shareholders. We are also instituting an employee retention plan for the nonexecutive members of our team. When your stock declines, like ours did, it creates many short-term issues, but it also creates significant opportunity.

In the short term, we will face lost revenue for new business ventures, decreased growth in acquisitions and capital expenditures, and additional costs and expenses, including litigation expenses, all resulting from the misleading Seeking Alpha article.

With this short-term issue, we also find opportunities to benefit our shareholders by reinvesting in our company by buying back our shares. We intend to repurchase discounted shares, which allows us to increase the ownership of our farms at deep discounts for the benefit of all shareholders.

186. On August 13, 2018, *Seeking Alpha* published another report authored by "Beyond Saving" titled "Farmland Partners: Opacity." The report, *inter alia,* challenges defendant Pittman's accusation that the Rota Fortunae Report caused the Company's revenue guidance reduction and dividend cut, explaining that both were likely to occur regardless of the report due to the Company's poor performance. Beyond Saving stated:

The big change is revenue, coming in $2 million lower than projected. In the conference call, Mr. Pittman suggested there was a JV deal that fell apart due to the article and ensuing price drop. It makes sense that such a thing could happen, especially if FPI was intending to contribute equity to the deal. What confuses me is how annual guidance could have been counting on such a deal for revenue when it can't be reasonably expected to close until late in Q3 or Q4.

187. Beyond Saving also criticized Farmland Partners' for its consistent lack of transparency, noting that the Company "routinely has poor transparency on numbers that are important to investors." Beyond Saving points out that if the Company's management, *i.e.* the

Individual Defendants had been transparent concerning FPI's business, the Rota Fortuna Report's impact on the Company would have not been as severe. Beyond Saving stated:

> If I have to summarize my criticisms of FPI in one word, it would be "opacity". As I discussed in previous articles, FPI routinely has poor transparency on numbers that are important to investors.
>
> Basic things like leasing spreads, acquisition cap rates, disposition cap rates and tenant defaults have inadequate disclosures. Rota Fortunae demonstrated how applying a story to small pieces of factual information can lead to a very negative result. If FPI had been more transparent up front, Rota's allegations likely would have had much less impact. The only thing the market hates more than bad news is the unknown.
>
> FPI should take this opportunity to consider being more open with investors. Provide same-store numbers in a way that is clear. Provide information on leasing trends, which sections of the portfolio are strengthening, and which are weaker? When properties are acquired, what are the initial leases? How many tenants are defaulting? Investors shouldn't find out about defaults and bankruptcies from an anonymous contributor on Seeking Alpha.
>
> Providing information in a clear and digestible manner will go a long way towards helping rebuild investor confidence in management.

188.    On November 6, 2018, the Company hosted an earnings call with analysts and investors to discuss Farmland Partners' third quarter 2018 results. During his opening statement, defendant Pittman touted the Company's continued effort "to achieve justice and financial recovery for [its] shareholders for the damage caused by ... [the] Rota Fortunae [Report]." These efforts to rebut the Rota Fortunae Report to date remain unsuccessful.

189.    The fruitless efforts of defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good to remedy the Rota Fortunae Report caused by their own wrongdoing have only increased the costs and damages borne by the Company. Farmland Partners' Annual Report on Form 10-K for the year ended December 31, 2018, filed with the SEC on March 15, 2019, discloses legal

and accounting expenses of $2.33 million, representing over a 60% increase from the previous year. Farmland Partners explained these increased expenses were "primarily attributable to increased costs related to litigation for the Rota Fortunae matter."

**THE INDIVIDUAL DEFENDANTS CAUSE FPI TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES**

190.    In breach of their duties to Farmland Partners, and in violation of section l0(b) of the Exchange Act and SEC Rule 10b-5, the Individual Defendants caused or approved the Company's repurchase of 1.9 million shares of its own stock at artificially inflated prices. Despite knowingly or recklessly disregarding that the Company's stock price was inflated due to the improper statements detailed herein, the Individual Defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases described herein.

191.    Between August 2017 and March 2018, while concealing the related party loans made to Niebur and Hough and their general mismanagement of the Company through various false and misleading statements, the Individual Defendants caused or allowed Farmland Partners to pay over $16.5 million to repurchase its stock for an average price of $8.69 per share. Specifically, the Individual Defendants caused Farmland Partners to make the following repurchases:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|--------|--------------------|--------------------------|-----------------------------|
| Aug 2017 | 274,000 | $8.54 | $2,339 960 |
| Sep 2017 | 567,000 | $9.00 | $5,103,000 |
| Oct 2017 | 279,000 | $9.15 | $2,552,850 |
| Mar 2018 | 780,029 | $8.36 | $6,521,042 |
| **Total** | **1,900,029** | | **$16,516,852** |

192.     Through these repurchases that harmed  the Company, the Individual Defendants represented to investors and the market that Farmland Partners' shares were undervalued and that the repurchases were the best use of the Company's cash. This was untrue.

193.     As of December 31, 2018, Farmland Partners had a mere $16.9 million of cash and cash equivalents on hand compared to $53.5 million as of December 31, 2017, and $47.2 million as of December 31, 2016. The above repurchases that the Individual Defendants caused the Company to buy, over $16.5 million worth of Farmland Partners' stock, thus substantially reduced the Company's cash on hand.

194.     When the truth about the Individual Defendants' related party loans to Niebur and Hough and general mismanagement came to light, FPI's common stock price plummeted from $8.65 per share to $5.28 per share. The Company's common stock has failed to recover from the Rota Fortunae Report's disclosures and continues to languish in the $6 to $7 range. As a result, the 1.9 million shares the Company repurchased between August 2017 and March 2018 for $16.5 million were only worth, assuming an average purchase price of $6.50, approximately $12.35 million, for an expense of approximately $4.15 million to Farmland Partners.

## DAMAGES TO FARMLAND PARTNERS

195.     As a result of the Individual Defendants' improprieties, Farmland Partners disseminated improper, public statements concerning the FPI Loan Program, related-party transactions, and future financial prospects. These improper statements have devastated Farmland Partners' credibility, as reflected by the Company's common stock plummeting by nearly 39% upon the Rota Fortunae Report's publication, erasing more than $110 million in market capitalization in a single day. To date, the Company's common stock has yet to recover.

196. Furthermore, the Individual Defendants have caused the Company to waste millions of dollars buying back FPI's own shares at artificially inflated prices.

197. Additionally, as a direct and proximate result of the Individual Defendants' actions, Farmland Partners has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action. This is truer than ever now that the Securities Class Action has survived a motion to dismiss.

198. The Securities Class Action, however, is not the only litigation costing the Company money due to the Individual Defendants wrongdoing, FPI is also bearing the costs incurred from initiating and pursuing the Defamation Lawsuit, even though the Rota Fortunae Report is merely an outgrowth of the Individual Defendants' actions.

199. Finally, the Company will also bear the burden of the defaulted related party loans themselves, as well as the undeserved and unwarranted compensation and benefits paid to defendants Pittman, Fabbri and Cowan.

## DERIVATIVE AND DEMAND ALLEGATIONS

200. Plaintiff brings this action derivatively on behalf of Farmland Partners to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' violations and breaches of fiduciary duty alleged herein. Farmland Partners is named as a nominal defendant solely in a derivative capacity.

201. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel experienced in derivative litigation.

202.     Plaintiff was a stockholder of Farmland Partners at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Farmland Partners stockholder.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

203.     The wrongful acts complained of herein subject, and will continue to subject, Farmland Partners to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

204.     The wrongful acts complained of herein were unlawfully concealed from Farmland Partners' stockholders.

205.     Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.   The course of action involved misrepresenting the financial integrity of the Company, and caused the Individual Defendants to breach the following corporate principles, among others: (a) the Individual Defendants were using the FPI Loan Program to issue loans to related parties, not "third-party farmers" as represented to the investing public; (b) these related party loans were issued without properly vetting the borrower's ability to pay, were not negotiated at arm's-length, reflected more lenient underwriting standards than those with third parties, and presented increased risks beyond those traditionally associated with being a lender; (c) the Individual Defendants failed to disclose the loans to Niebur and Hough as related party transactions, in violation of GAAP; (d) the Individual Defendants were inflating FPI's revenue and earnings by issuing these loans to relate party tenants who would then circle the money back to the Company in the form of rent payment;   (e) the Individual Defendants

failed to maintain books and records that accurately and fairly reflect the Company's transactions; (f) the Individual Defendants failed to maintain a system of internal controls that will provide reasonable assurances to management that material information about the Company is made known to management, particularly during the periods in which the Company's periodic reports are being prepared; and (g) as a result of the foregoing, the Individual Defendants' statements concerning the Company's financial results and future prospects, compliance with GAAP, and effectiveness of its internal controls were improper.

206.    The current Board of Farmland Partners consists of the following five defendants: Pittman, Downey, Bartels, Glauber, and Good (collectively, the "Director Defendants").

207.    On August 1, 2019, Plaintiff made the Demand on the Board to commence an action against the Individual Defendants. *See* Exhibit A. The Demand and the allegations therein are incorporated herein by reference.

208.    Over a month later, on September 10, 2019, counsel for the Company and the Board responded to the Demand by asking Plaintiff for proof of Plaintiff's FPI holdings (the "September 10, 2019 Letter"). A copy of the September 10, 2019 Letter is attached hereto and made part hereof as Exhibit B.

209.    Plaintiff promptly provided proof of her holdings on September 16, 2019 (the "September 16, 2019 Letter"). A copy of the September 16, 2019 Letter is attached hereto ad made part hereof as Exhibit C.

210.    In what can only be considered an attempt to protect themselves and their co-defendants, the Director Defendants have yet to provide a substantive response to Plaintiff's Demand.

211. Over three months have now passed since Plaintiff made her Demand, and even though the Securities Class Action has survived a motion to dismiss and the Board is well aware of the allegations made in the Demand, the Director Defendants continue to stonewall the Plaintiff with no response.

212. Basic tenets of corporate law entrust the board of directors with the power to make decisions on the company's behalf, including the power to decide whether (and when) to initiate litigation pursuit to a demand. Under Delaware law, however, a board cannot simply ignore the demand.

213. This is exactly what the Director Defendants have done here. The Director Defendants have failed to fulfill their obligation of responding to the Demand leaving Plaintiff no choice but to consider her Demand refused.[1]

## COUNT I

**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

214. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

215. The Individual Defendants owed and owe Farmland Partners fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe FPI the highest obligation of good faith, fair dealing, loyalty and due care.

---

[1] In addition, it has come to Plaintiff's attention of another derivative action captioned, *Luger v. Pittman, et al.*, case no. 8:19-cv-02882-TDC filed in the United States District Court for the District of Maryland, that a different shareholder also made a litigation demand on the Board and received a rejection letter. On November 25, 2019 a notice of voluntary dismissal was filed.

216. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

217. The Individual Defendants had actual or constructive knowledge that they had improperly failed to disclose related party transactions with Niebur and Hough and made false and misleading statements regarding the FPI Loan Program in connection therewith, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Farmland Partners has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219. Plaintiff, on behalf of FPI, has no adequate remedy at law.

## COUNT II

### VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 OF THE EXCHANGE ACT (AGAINST INDIVIDUAL DEFENDANTS)

220. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221. During the Relevant Period, in connection with FPI's repurchases of Farmland Partners shares, the Individual Defendants improperly approved related party loans to Niebur and Hough and disseminated or approved false or misleading statements about the FPI Loan Program as specified in ¶¶190-194 which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the

Company's common stock.

222.     At the same time that the price of the Company's common stock was inflated due to the wrongdoing and false or misleading statements made by the Individual Defendants, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' wrongdoing and false or misleading statements. The Individual Defendants engaged in a scheme to defraud Farmland Partners by causing the Company to purchase over $16.5 million in shares of FPI stock at artificially inflated prices.

223.     The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon FPI in connection with the Company's purchases of its own stock during the Relevant Period.

224.     The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in

connection with the purchase and sale of FPI stock, which were intended to, and did, (a) deceive Farmland Partners regarding, among other things, the related party transactions undertaken by the Individual Defendants, the FPI Loan Program, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of FPI stock; and (c) cause Farmland Partners to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, the Individual Defendants were in possession of material, adverse non-public information regarding the related party transactions and the FPI Loan Program.

225.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

226.    As described above, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the Individual Defendants should have been aware of them. Throughout the Relevant Period, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

227.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

228.    As a result of the Individual Defendants' misconduct, FPI has and will suffer

damages in that it paid artificially inflated prices for its own common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the related party transactions and the FPI Loan Program were disclosed in July 2018. Farmland Partners would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' wrongdoing and false or misleading statements.

229. As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of FPI stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

230. Plaintiff brought this claim within two years of her discovery of the facts constituting the violation and within five years of the violation.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232. As a noted above, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

233. As further noted above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action caused by improper statements.

234. Defendants Pittman, Fabbri, Downey, Bartels, Glauber and Good then compounded this problem by wasting corporate assets suing Rota Fortunae for merely reporting about the related party transactions which the Individual Defendants themselves improperly hid from the investing public.

235. Finally, as a result of the misconduct described above, the Individual Defendants have wasted corporate assets by issuing loans to related parties Niebur and Hough that were unfavorable and ultimately detrimental to the Company.

236. As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## COUNT IV

### AGAINST DEFENDANTS PITTMAN, FABBRI, BARTELS AND BOARDMAN FOR UNJUST ENRICHMENT

237. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238. By their wrongful acts and omissions, defendants Pittman, Fabbri and Cowan were unjustly enriched at the expense of and to the detriment of Farmland Partners. Defendants Pittman, Fabbri and Cowan were unjustly enriched as a result of the compensation and other benefits and they received while breaching the duties they owed to Farmland Partners.

239. Defendants Bartels and Boardman, as the Insider Selling Defendants, were unjustly enriched by their receipt of proceeds from their illegal sales of FPI common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

240. Plaintiff, as a stockholder and representative of Farmland Partners, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, compensation, and/or proceeds from illegal sales of FPI stock obtained by these defendants, and each of them, from their wrongful conduct and breaches of duties.

**COUNT V**

**AGAINST DEFENDANTS BARTELS AND BOARDMAN (INSIDER SELLING DEFENDANTS)
FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

241. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242. At the time each of the Insider Selling Defendants sold his FPI stock, he knew the material, non-public information described above, and sold FPI stock on the basis of such information.

243. The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects. It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his own benefit when he sold personal holdings in FPI stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of FPI stock.

244. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his fiduciary duties of loyalty and good faith. Each of the Insider Selling Defendants is therefore liable to FPI for insider trading.

245.     Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

246.     Plaintiff, on behalf of FPI , has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands for a judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Farmland Partners and that Plaintiff is a proper and adequate representative of the Company;

B.     Determining the Individual Defendants have breached their fiduciary duties and committed other violations of law;

C.     Declaring that the Individual Defendants are obligated to contribute to, indemnify and hold Farmland Partners harmless from any fines, penalties, judgment, settlement or award pursuant to any of the actions pending or to be filed against Farmland Partners or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

D.     Awarding Farmland Partners the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

E.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

F.     Ordering defendants Pittman, Fabrii and Cowan to disgorge all profits, benefits, and other compensation obtained during the Relevant Period and imposing a constructive trust in favor of the Company for the amount of the proceeds;

G.     Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of FPI stock while in possession of insider information as described herein and imposing a constructive trust in favor of the Company for the amount of the proceeds;

H.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

I.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

Dated: November 26, 2019           Respectfully submitted,

*/s/ Rusty E. Glenn*
Rusty E. Glenn
**THE SHUMAN LAW FIRM**
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com


**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone:  (484) 875-3116
Facsimile:   (484) 875-9273

**KASKELA LAW, LLC**
D. Seamus Kaskela
18 Campus Boulevard
Suite 100
Newtown Square, PA 19073
Telephone: (888) 715-1740

*Attorneys for Plaintiff*

DocuSign Envelope ID: 7668686B-5561-4740-9FA8-6C5D3C85124E

## VERIFICATION

I, Anna Barber, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

11/25/2019

_____
Date

DocuSigned by:

*Anna Barber*
6E253F998C6342A...

_____
Anna Barber